# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

ERIC SEAN JORDAN,                    CASE NO. 2:08-cv-0632
                                     JUDGE SARGUS
          Petitioner,              MAGISTRATE JUDGE KEMP

v.

WARDEN, LEBANON CORRECTIONAL
INSTITUTION,

          Respondent.

## REPORT AND RECOMMENDATION

Petitioner, a state prisoner, brings the instant petition for a writ of habeas corpus

pursuant to 28 U.S.C. §2254. This matter is before the Court on the instant petition and

supplemental memorandum in support, respondent's return of writ, and the exhibits of the

parties. For the reasons that follow, the Magistrate Judge **RECOMMENDS** that this action

be **DISMISSED.**

## FACTS and PROCEDURAL HISTORY

The Ohio Seventh District Court of Appeals summarized the facts and procedural

history of this case as follows:

> Jordan lived with his girlfriend, Christina Poch, for eight years
> prior to March 2005 with her sons, her daughter (AP), and a
> baby which had been placed in their custody. Christina was
> divorced from her children's father and Jordan acted as a
> stepfather to AP.
>
> In March 2005, AP's friend, CA, stayed with the Poch family at
> Jordan's home over Easter weekend. On Saturday, March 26th,
> Christina bought her son a bottle of Bacardi 151 rum. On
> Monday, March 28th, Christina left for work and Jordan took
> AP to the home of another friend, KW, at 9:30. Jordan injured

his shoulder during the day, saw Christina at her workplace at 2:00, and left the baby with a babysitter at 2:45 before seeking medical treatment at the hospital at 3:40.

CA testified that she stayed at Jordan's home while he took AP to KW's home, expecting her father to pick her up and take her out for the morning. She said her father never appeared and Jordan had her drink the Bacardi 151, performed oral sex on her, had her perform oral sex on him, and engaged in sexual intercourse with her. She testified that this occurred between 10:00 and 11:00 and that she laid down afterward. She stated that the baby was in the house at the time of the sexual assault, but was not present when she woke up. She then said that Jordan took her to KW's home at around 3:00.

Jordan testified that CA had stayed the night, but was not at his house when he and AP left that Monday morning. He said that he went to his brother's home with the baby after leaving AP at KW's home and was there from 10:00 until 11:30. He then went back home with the baby until 12:45, when CA appeared and asked for a ride to KW's house. He took her there and arrived back home soon after 1:00. His sister-in-law then visited with a friend from 1:30 until 2:00. He then left to visit Christina at her work, took the baby to the babysitter, and sought medical attention.

That evening, Jordan picked AP and CA up from KW's and brought them to his home, where they stayed until school the next day. At school, CA reported the assault to a teacher. Both Children's Services and the police were notified. AP then told investigators that Jordan had sexually assaulted her three times between January and March 2005.

On May 6, 2005, the Harrison County Grand Jury filed a nine-count indictment against Jordan. That indictment charged him with the following offenses with regard to CA: 1) rape under R.C. 2907.02(A)(2), rape under R.C. 2907.02(A)(1)(c), unlawful sexual conduct with a minor under R.C. 2907.04(A), and disseminating matter harmful to juveniles under R.C. 2907.31(A)(1). It then charged him with the following offenses with regard to AP: 1) rape under R.C. 2907.02(A)(2), rape

under R.C. 2907.02(A)(1)(c), sexual battery under R.C. 2907.03(A)(5). Finally, the indictment charged Jordan with the following offenses with regard to KW: 1) importuning under R.C. 2907.07(B) and 2) disseminating matter harmful to juveniles under R.C. 2907.31(A)(1).

The matter proceeded to a jury trial in February 2006. Before the matter was submitted to the jury, the State dismissed the charge alleging disseminating matter harmful to juveniles under R.C. 2907.31(A)(1) with regard to KW. The jury then acquitted Jordan of three counts: 1) the rape against CA under R.C. 2907.02(A)(2), 2) the other count of disseminating matter harmful to juveniles, and 3) importuning. The trial court merged all of the offenses with regard to CA into one count of rape under R.C. 2907.02(A)(1)(c) for the purposes of sentencing and sentenced Jordan to eight years imprisonment. It then merged all of the offenses with regard to AP into one count of rape under R.C. 2907.02(A)(2) for the purposes of sentencing and sentenced Jordan to ten years imprisonment. It then ordered that Jordan serve these two terms of imprisonment consecutively, for a total of eighteen years.

*State v. Jordan,* 2007 WL 1880029 (Ohio 7th App. Dist. June 22, 2007). Petitioner filed a timely

appeal in which he asserted the following assignments of error:

1. The trial court erred in allowing Mr. Carrothers to testify Mr. Jordan raped AP and CA constituting prejudicial error because there was no foundational basis for Mr. Carrothers opinion in violation of Evid.R. 702(C).

2. Mr. Jordan was denied his constitutional right to a fair trial when the trial court allowed Mr. Carrothers to testify to the veracity of AP and CA's statements.

3. Mr. Jordan was denied his constitutional rights to due process and a fair trial when the prosecutor engaged in misconduct by stating, without any evidentiary basis during, closing argument, that Mr. Carrothers, who is trained to investigate sexual abuse cases, believed CA and AP were telling the truth bolstering the victims' testimony.

4. The trial court erred in refusing to allow the testimony of another witness concerning the past sexual activity of the victim, offered to refute AP's direct testimony she was a virgin.

5. Mr. Jordan was denied his constitutional guarantee of effective assistance of counsel.

6. There was insufficient evidence to convict Mr. Jordan of rape because the State failed prove [sic] each and every element of the charged offenses beyond a reasonable doubt.

7. Mr. Jordan's conviction was against the manifest weight of the evidence violating his constitutional rights.

On June 22, 2007, the appellate court affirmed the judgment of the trial court. *Id*. On November 21, 2007, the Ohio Supreme Court dismissed petitioner's subsequent appeal. *State v. Jordan*, 116 Ohio St.3d 1412 (2007).

On August 13, 2007, petitioner filed an application to reopen the appeal pursuant to Ohio Appellate Rule 26(B). He asserted that he had been denied the effective assistance of appellate counsel because his attorney failed to raise on appeal the following claims:

1. Defendant's due process right to notice of the charges and opportunity to be heard, and the right to trial by jury, his Fifth, Sixth and Fourteenth Amendment rights were violated when the trial court exceeded the statutory maximum sentence mandated by O.R.C. §2929.14. The decision rendered by *State v. Foster* (2006), 109 Ohio St.3d 1, which purports to authorize sentences in excess of the statutory maximum, is incompatible with the controlling precedent of the United States Supreme Court and must be rejected.

2. The trial court erred in imposing consecutive terms of incarceration, absent the statutory authority, violating appellant's right to due process and equal protection of law.

3. Defendant's sentence violated his rights under the Ex Post

Facto Clause of the federal Constitution by sentencing defendant to a term of incarceration which exceeded the maximum penalty available under the statutory framework at the time of the offense.

4. Mr. Jordan was denied his constitutional guarantee of effective assistance of counsel, when trial counsel failed to employ an expert witness to impeach the State's exert, Mr. Carrothers.

*Exhibit 8 to Return of Writ.* On September 25, 2007, the appellate court denied petitioner's Rule 26(B) application. *Exhibit 9 to Return of Writ.* On January 23, 2008, the Ohio Supreme Court dismissed petitioner's subsequent appeal as not involving any substantial constitutional question. *Exhibit 11 to Return of Writ.*

On June 30, 2008, petitioner filed the instant petition for a writ of habeas corpus pursuant to 28 U.S.C. §2254. He alleges that he is in the custody of the respondent in violation of the Constitution of the United States based upon the following grounds (*recited here verbatim*):

1. Petitioner was denied due process and a fair trial by qualifying and allowing an expert witness to testify that he substantiated the rape allegations through scientific evidence.

The trial court abused its discretion and violated petitioner's due process right to a fair trial by qualifying and allowing the state's expert witness to use scientifically unreliable techniques to determine a fact at issue and sway the trier of fact's understanding of the evidence.

2. Petitioner was denied due process right to fair trial where trial court allowed expert testimony as to the veracity of the witness statements.

The trial court violated due process by allowing an expert

witness to testify that he used scientific training to prove that the Petitioner sexually abused the two girls, thereby relieving the jury of the[ir] burden of determining guilt or not guilt.

3.  Petitioner was denied his due process right to a fair trial where the prosecutor engaged in misconduct.

The prosecutor's use of expert testimony to bolster the testimony of the witnesses and remarks during closing were improper and prejudicially [a]ffected the substantial rights of the Petitioner.

4.  The trial court violated Petitioner's due process rights and Petitioner's right to compel and confront witness to rebut testimony that the victim was a virgin.

The prosecutor opened the door, thereby waiving the protection of R.C. 2907.02(D) and the trial court violated Petitioner's constitutional right to compel and confront witness as to previous sexual experiences, presenting a defense and laying a foundation to the existence of bruising, to uninflame the jury.

5.  The Petitioner was denied his Constitutional right to the effective assistance of trial counsel.

Trial counsel was ineffective for failing to provide expert witness to defend and rebut non-traditional DNA testing, and explain the effects of Tretiary transfer.

6.  There was insufficient evidence to convict Mr. Jordan of rape because the state failed to prove each and every element of the charged offenses beyond a reasonable doubt.

The state failed to prove that any sexual activity occurred or that force or the threat of force was used during the alleged incidences, the presumption of innocence, the burden of proof beyond a reasonable doubt and the theory of corpus delicti cannot be overcome by unreliable she said testimony and prosecutor misconduct.

7.  Ineffective assistance of appellate counsel.

Appellate counsel overlooked significant and obvious issues of constitutional magnitude that Petitioner would be prejudiced by the failure to raise on direct appeal.

8.  Petitioner's sentence void, violating 5th, 6th, and 14th Amendment due process right to notice of charges, the opportunity to defend and, the right to proof beyond a reasonable doubt by jury determination thereby lowering prosecutions burden of proof to zero.

The trial court made judicial fact finding of elements not presented in a charging instrument to enhance Petitioner's sentence beyond the statutory maximum based upon facts to which Petitioner had no notice of any opportunity to defend against, deprived of any jury findings of such elements or proof thereof beyond a reasonable doubt the trial court lowered the prosecution's burden of proof to a standard of zero.

9.  The trial court violated Petitioner's right to due process and equal protection of law under the Federal and Ohio Constitution by imposing consecutive terms of incarceration without statutory authority.

The Ohio Supreme Court severed and excised all statutory provisions that enabled the imposition of consecutive sentences, thereby removing the trial court's statutory authority to impose consecutive sentences by virtue of the Ohio and Federal Constitution.

10.  The trial court violated the Ex Post Facto Clause of the Federal Constitution when it sentenced Petitioner to a term of incarceration that exceeded the maximum penalty available under the statutory framework at the time of the offense.

11.  Ineffective assistance of trial counsel by refusing to provide a defendant with an expert witness to impeach the state's expert, allowing this testimony to go unimposed.

Petitioner was denied effective representation when trial counsel refused to provide an expert in child sexual abuse to interview the alleged victims, and impeach the testimony of the State's expert Mr. Carrothers, allowing the testimony to go unimposed.

On August 29, 2008, through counsel, petitioner amended his habeas corpus petition to assert the following additional claims:

12. The prosecutor violated the petitioner's due process rights by violating Ohio's rape shield law in an effort to improperly inflame the jury.

13. By violating the due process guarantees incorporated in the rape shield law, the prosecution waived and the complainant acquiesced in the waiver of the confrontation prohibitions of the rape shield law.

14. A conviction must be vacated where counsel's errors fell below an objective standard of reasonable representation and the defendant was prejudiced thereby.

*Supplemental Memorandum Supporting Petition,* Doc. No. 10. It is the position of the respondent that petitioner's claims are procedurally defaulted or without merit.

## PROCEDURAL DEFAULT

In recognition of the equal obligation of the state courts to protect the constitutional rights of criminal defendants, and in order to prevent needless friction between the state and federal courts, a state criminal defendant with federal constitutional claims is required fairly to present those claims to the highest court of the state for consideration. 28 U.S.C. §2254(b), (c). If he fails to do so, but still has an avenue open to him by which he may present the claims, his petition is subject to dismissal for failure to exhaust state remedies. *Id.;Anderson v. Harless,* 459 U.S. 4, 6 (1982) (*per curiam; Picard v. Connor*, 404 U.S. 270, 275-76

(1971). If, because of a procedural default, the petitioner can no longer present his claims to a state court, he has also waived them for purposes of federal habeas review unless he can demonstrate cause for the procedural default and actual prejudice resulting from the alleged constitutional error. *Murray v. Carrier*, 477 U.S. 478, 485 (1986); *Engle v. Isaac*, 456 U.S. 107, 129 (1982);*Wainwright v. Sykes*, 433 U.S. 72, 87 (1977).

In the Sixth Circuit, a four-part analysis must be undertaken when the state argues that a federal habeas claim is precluded by the petitioner's failure to observe a state procedural rule. *Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir.1986). "First, the court must determine that there is a state procedural rule that is applicable to the petitioner's claim and that the petitioner failed to comply with the rule." *Id*. Second, the Court must determine whether the state courts actually enforced the state procedural sanction. *Id*. Third, it must be decided whether the state procedural forfeiture is an adequate and independent state ground on which the state can rely to foreclose review of a federal constitutional claim. *Id.* Finally, if the Court has determined that a state procedural rule was not complied with and that the rule was an adequate and independent state ground, then the petitioner is required to demonstrate that there was cause for him not to follow the procedural rule and that he was actually prejudiced by the alleged constitutional error. *Id*. This "cause and prejudice" analysis also applies to failure to raise or preserve issues for review at the appellate level. *Leroy v. Marshall*, 757 F.2d 94 (6th Cir.1985).

In claim twelve (*i.e.*, supplemental claim one), petitioner asserts that he was denied a fair trial due to prosecutorial misconduct because the prosecutor violated Ohio's rape

shield law in an attempt to improperly inflame the jury by eliciting from the alleged victim that she had not previously had sex. *See Supplemental Memorandum in Support of Petition*, Doc. No. 10; *Trial Transcript*, at 269; 383-384. In claim fourteen (i.e, supplemental claim three), petitioner similarly asserts that he was denied the effective assistance of counsel because his attorney failed to object to questions by the prosecutor on direct examination of the alleged victim regarding her lack of prior sexual experience as violating the rape shield law or request a hearing under the rape shield law. The foregoing claims are readily apparent from the face of the record and therefore would properly be raised on direct appeal; however, petitioner failed to raise claims twelve and fourteen on direct appeal. *See Exhibit 3 to Return of Writ.* Further, he may now no longer present such claims to the state courts under Ohio's *res judicata. State v. Cole*, 2 Ohio St.3d 112 (1982); *State v. Ishmail*, 67 Ohio St.2d 16 (1981); *State v. Perry*, 10 Ohio St.2d 175 (1967). The state courts were never given the opportunity to enforce the procedural rule at issue due to the nature of petitioner's procedural default. This Court deems the first and second parts of the *Maupin* test to have been met.

Respondent contends that petitioner has likewise waived claim thirteen (*i.e.*, supplemental claim two) and claim four for federal habeas corpus review because he failed to raise these issues on direct appeal. However, the record reflects that petitioner asserted on direct appeal that he had been denied a fair trial and the right to present a defense and confront his accuser because the trial court prohibited him from questioning Poch on cross examination as to whether the alleged victim had confided to Poch that she had previously

had sex. Petitioner specifically argued that the prosecutor waived protection of Ohio's rape shield law by eliciting from the alleged victim she had not previously had sex. *See Exhibit 3 to Return of Writ*, at 32-33. Petitioner made these same arguments in his appeal to the Ohio Supreme Court. *See Exhibit 6 to Return of Writ*. He raises this same claim here. Therefore, this Court will address the merits of claims four and thirteen (*i.e.*, supplemental claim two).

As to claims twelve and fourteen, the Court must decide whether the procedural rules at issue constitute adequate and independent bases upon which to foreclose review of the petitioner's federal constitutional claims. This task requires the Court to balance the state's interests behind each procedural rule against the federal interest in reviewing federal claims. *See Maupin v. Smith*, 785 F.2d at 138. The Court of Appeals for the Sixth Circuit has consistently held that Ohio's doctrine of *res judicata, i.e.,* the *Perry* rule, is an adequate ground for denying federal habeas relief. *Lundgren v. Mitchell*, 440 F.3d 754, 765 (6th Cir.2006)*; Coleman v. Mitchell,* 268 F.3d 417, 427-29 (6th Cir.2001); *Seymour v. Walker,* 224 F.3d 542, 555 (6th Cir.2000); *Byrd v. Collins*, 209 F.3d 486, 521-22 (6th Cir.2000); *Norris v. Schotten,* 146 F.3d 314, 332 (6th Cir.1998). The doctrine of *res judicata* is stated in unmistakable terms in countless Ohio decisions, and Ohio courts have consistently refused, in reliance on that doctrine, to review the merits of claims. *See State v. Cole, supra; State v. Ishmail, supra*. Further, the doctrine of *res judicata* serves the state's interest in finality and in ensuring that claims are adjudicated at the earliest possible opportunity. With respect to the independence prong, the Court concludes that *res judicata* does not rely on or

otherwise implicate federal law. The third part of the *Maupin* test has been met.

Petitioner has waived his right to present claims twelve and fourteen (*i.e.*, supplemental claims one and three) for federal habeas corpus review. He may still obtain review of these claims on the merits if he establishes cause for his procedural default, as well as actual prejudice from the alleged constitutional violations. Petitioner has failed to establish cause for his procedural defaults.

Beyond the four-part *Maupin* analysis, this Court is required to consider whether this is "an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Murray v. Carrier*, 477 U.S. at 491; *see also Sawyer v. Whitley*, 505 U.S. 333. After review of the record, the Court does not deem this to be such a case.

## CLAIMS ONE AND TWO

In claim one, petitioner asserts that he was denied a fair trial because Demetrius Carrothers, a social services worker with the Harrison County Department of Job and Family Services, testified he had "substantiated" allegations of sexual abuse, *see Transcript*, at 617, based on what petitioner contends were unreliable information or methods. In claim two, petitioner asserts that he was denied a fair trial because Carrothers thereby improperly testified as to the veracity of the alleged victim. The state appellate court rejected these claims as follows:

> In his first assignment of error, Jordan argues:
>
> "The trial court erred in allowing Mr. Carrothers to testify Mr.

Jordan raped AP and CA constituting prejudicial error because there was no foundational basis for Mr. Carrothers opinion in violation of Evid.R. 702(C)."

Jordan contends that the trial court erred when it allowed the social worker involved in the case, Demitrious Carrothers, to testify as an expert. He concedes that Carrothers had sufficient specialized knowledge, experience, and training to qualify him as an expert in the area of sexual abuse. However, he argues that Carrothers' opinions in this case were not based on reliable information and, therefore, it was improper for the trial court to allow Carrothers to express those opinions under Evid.R. 702.

The determination of the admissibility of expert testimony is within the discretion of the trial court and its decision will not be disturbed absent an abuse of that discretion. *Valentine v. Conrad*, 110 Ohio St.3d 42, 2006-Ohio-3561, at ¶ 9. The phrase "abuse of discretion" connotes more than an error of law or judgment; it implies that the trial court acted unreasonably, arbitrarily, or unconscionably. *State v. Adams* (1980), 62 Ohio St.2d 151, 157.

Evid.R. 702 provides:

"A witness may testify as an expert if all of the following apply:

"(A) The witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons;

"(B) The witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony;

"(C) The witness' testimony is based on reliable scientific, technical, or other specialized information."

"Most jurors would not be aware, in their everyday experiences, of how sexually abused children might respond

to abuse[, so] an expert's opinion testimony on whether there was sexual abuse would aid jurors in making their decision and is, therefore, admissible pursuant to Evid.R. 702 and 704." *State v. Boston* (1989), 46 Ohio St.3d 108, 128. Accordingly, there is no dispute regarding whether Carrothers' testimony relates to matters beyond the knowledge or experience possessed by lay persons. See Evid.R. 702(A). Likewise, Jordan concedes that Carrothers' credentials and experience qualify him as an expert under Evid.R. 702(B). The sole issue, then, is whether the testimony in question is reliable under Evid.R. 702(C).

The Ohio Supreme Court recently stated that the reliability of an expert's testimony depends on whether it "is based on scientifically valid principles and methods. A court should not focus on whether the expert opinion is correct or whether the testimony satisfies the proponent's burden of proof at trial. Accordingly, we are not concerned with the substance of the experts' conclusions; our focus is on how the experts arrived at their conclusions." (Citations omitted) *Valentine* at ¶ 16. Thus, the reliability of an expert's opinion rests on "the principles and methodology that underlie [that] opinion. * * * It is that determination that ensures that the testimony will be helpful to the trier of fact." *Id.* at 17.

In this case, Jordan does not challenge the principles and methodology underlying Carrothers' opinion. Instead, he challenges the reliability and correctness of the facts Carrothers relied upon when reaching his opinion. However, *Valentine* clearly says that the focus of Evid.R. 702(C) is on the reliability of the expert's methodology. Thus, Jordan's arguments concerning Carrothers' ability to testify as an expert is meritless.

Expert's Opinion on Child's Truthfulness

In his second assignment of error, Jordan argues:

"Mr. Jordan was denied his constitutional right to a fair trial when the trial court allowed Mr. Carrothers to testify to the veracity of AP and CA's statements."

Jordan contends that Carrothers improperly bolstered the testimony of both CA and AP when he testified that he had "substantiated" the girls' claims of abuse. He maintains that Carrothers' opinions were based almost solely on the girls' statements and, therefore, that his opinion was nothing more than an opinion on their veracity.

As acknowledged above, an expert can opine on whether he or she believes that a child has been sexually abused. *Boston* at 128. However, an expert cannot give an opinion of the veracity of the statements of a child declarant. *Id*. at syllabus. The Ohio Supreme Court has been careful to differentiate "between expert testimony that a child witness is telling the truth and evidence which bolsters a child's credibility." *State v. Stowers*, 81 Ohio St.3d 260, 262, 1998-Ohio-0632. The former is inadmissible, while the latter is perfectly permissible. Thus, an expert can testify that a child's behavior is consistent with the behavior of other children who had been sexually abused. *Id*.

We recently addressed whether an expert improperly opined on a child's truthfulness in *State v. Schewirey*, 7th Dist. No. 05 MA 155, 2006-Ohio-7054. In that case, a doctor examined a child for sexual abuse, but could not make any physical findings. Nevertheless, the doctor diagnosed the child as a sexually abused child. On cross-examination, the doctor admitted that her diagnosis was based solely on the story related to her by the child.

We held that the doctor's opinion in that case was "nothing more than an opinion on the veracity of Child M's allegations" since it was based on nothing more than what the child told her. *Id.* at ¶ 51. However, we clarified that "an expert does not need physical findings to reach a diagnosis. If the expert relies on other facts in addition to the child's statements, then the expert's opinion will not be an improper statement on the child's veracity." *Id*. at ¶ 50.

In this case, Carrothers testified that he concluded that CA's allegations of sexual abuse were "substantiated." He gave the following factors as the basis for this conclusion:

"The primary one was the information I had received from Southeastern Ohio Regional Medical Center by Dr. Dayton and Ms. Hill. Second was the statements that CA had given me in regards to the adult known to her, private's, his penis, and his methodology of how he liked to have intercourse was also corroborated by Ms. Poch. And those kind of details should be unknown to a child that hadn't had sexual relations with that person."

Carrothers also "substantiated" AP's allegations. He relied on the following facts to make this decision:

"With AP's, the crux there was the details of her statement. Unfortunately there wasn't the physical evidence but the details which she provided, her emotional state during the disclosure, her body language during the disclosure, all very consistent with other substantiated cases of sexual abuse that I've dealt with. And that combined with the sister case with CA my supervisor and I both sat down and discussed it and determined substantiated sexual abuse was warranted in this case."

This testimony shows that Carrothers based his opinion on more than the girls' allegations. He relied on the results of the physical examination of CA, the physical descriptions of Jordan's male anatomy, the girls' demeanor, and his past experience of dealing with many sexually abused children. Accordingly, his opinion may have bolstered the girls' credibility, but he did not give an opinion on their veracity.

Finally, the trial court ameliorated any hint that "substantiating" the allegations was evidence that they were true. It instructed the jury as follows:

"You will recall this morning that Mr. Carrothers from the Department of Job and Family Services testified and he testified concerning findings that they made in their agency, substantiated, unsubstantiated or indicating allegations of abuse. I'm instructing you that the findings they make at the agency are completely separate from the findings that you'll be asked to make in this case. Those are administrative matters.

And I will be giving you instructions-as I've said before I will
be giving you instructions as to exactly what matters you have
to find, you have to address. So I want you to be aware of that
and I'm giving you that to assist you in keeping your mind
open and understanding the full scope of what you'll be asked
to do."

For all these reasons, Jordan's second assignment of error is
meritless.

*State v. Jordan, supra,* 2007 WL 1880029. The factual findings of the state appellate

court are presumed to be correct. 28 U.S.C. §2254(e)(1) provides:

In a proceeding instituted by an application for a writ of
habeas corpus by a person in custody pursuant to the
judgment of a State court, a determination of a factual issue
made by a State court shall be presumed to be correct. The
applicant shall have the burden of rebutting the presumption
of correctness by clear and convincing evidence.

Further, a federal habeas court may not grant relief unless the state court's decision was

contrary to or an unreasonable application of clearly established federal law, or based on

an unreasonable determination of the facts in light of the evidence that was presented. 28

U.S.C. §2254(d) provides:

An application for a writ of habeas corpus on behalf of a
person in custody pursuant to the judgment of a State court
shall not be granted with respect to any claim that was
adjudicated on the merits in State court proceedings unless the
adjudication of the claim-

(1) resulted in a decision that was contrary to, or involved an
unreasonable application of, clearly established Federal law, as
determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable
determination of the facts in light of the evidence presented in

the State court proceeding.

The United States District Court for the Western District of Michigan has summarized this standard as follows:

> [A] decision of the state court is "contrary to" such clearly established federal law "if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts." *Id.* at 413. A state court decision will be deemed an "unreasonable application" of clearly established federal law "if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* A federal habeas court may not find a state court's adjudication to be "unreasonable" "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* Further, the federal habeas court should not transform the inquiry into a subjective one by inquiring whether all reasonable jurists would agree that the application by the state court was unreasonable. *Id.*

*Williams v. Lavigne*, 2006 WL 2524220 (W.D. Michigan August 30, 2006), citing *Williams v. Taylor*, 529 U.S. 362 (2000). Petitioner has failed to meet this standard here.

Federal habeas review of state court evidentiary rulings is extremely limited. *Waters v. Kassulke,* 916 F.2d 329, 335 (6th Cir. 1990). Evidentiary questions generally do not rise to a constitutional level unless the error was so prejudicial as to deprive a defendant of a fundamentally fair trial, thereby violating due process. *Cooper v. Sowders*, 837 F.2d 284, 286 (6th Cir. 1988); *see also Walker v. Engle*, 703 F.2d 959, 962 (6th Cir. 1983). When such errors are alleged, the federal court's inquiry in reviewing these claims is directed to whether the evidence was rationally connected to the crime charged. *Carter v. Jago*, 637 F.2d 449, 457

(6th Cir. 1980).  Such were the circumstances here.

Claims one and two are without merit.

**CLAIM THREE**

In claim three, petitioner asserts that he was denied a fair trial due to prosecutorial misconduct based on improper remarks by the prosecutor during closing argument.  The state appellate court rejected this claim as follows:

> Jordan argues:
>
> "Mr. Jordan was denied his constitutional rights to due process and a fair trial when the prosecutor engaged in misconduct by stating, without any evidentiary basis during, closing argument, that Mr. Carrothers, who is trained to investigate sexual abuse cases, believed CA and AP were telling the truth bolstering the victims' testimony."
>
> Jordan contends that the prosecutor committed misconduct by stating in closing argument that Carrothers had "substantiated" CA's and AP's allegations of sexual abuse.
>
> A prosecutor cannot express his or her personal belief or opinion as to the credibility of a witness. *State v. Smith* (1984), 14 Ohio St.3d 13, 14. But a prosecutor may relate the facts the jury is entitled to consider when evaluating a witness's credibility. *State v. Watson* (1991), 61 Ohio St.3d 1, 10.
>
> In this case, the prosecutor merely repeated the evidence properly admitted into trial when he noted that Carrothers had "substantiated" the girls' allegations of sexual abuse. He stated as follows:
>
> "You heard from Demi Carrothers, Department of Job and Family Services, lead investigator on sexual assault cases. He substantiated sexual abuse in CA's case based on the injuries she received reported by Dr. Dayton, based on her demeanor at the time that he interviewed her, and based upon the

19

> statements that she made that were consistent with other sexual abuse cases that he's investigated.
>
> "He substantiated sexual abuse in AP's case based upon her statements, her demeanor, the fact that she gagged during the interview while she described what the defendant did to her."
>
> As can be seen, the prosecutor never expressed his personal belief on the credibility of either of the girls. Accordingly, Jordan's third assignment of error is meritless.

*State v. Jordan, supra.* Again, the record fails to reflect that the decision of the state appellate court is unreasonable such that habeas corpus relief is warranted. *See Williams v. Taylor, supra.*

The scope of federal habeas corpus review of a claim of prosecutorial misconduct is narrow. A federal court does not sit as an appellate court employing supervisory powers to rectify ordinary trial error in cases before it for habeas review. *Donnelly v. De Christoforo*, 416 U.S. 63 (1974). Rather, the Court must consider only whether the prosecutor's conduct was so egregious as to deny the petitioner fundamental fairness. *Id.* at 642-43; *Martin v. Foltz*, 773 F.2d 711, 716-17 (6th Cir.1985); *Angel v. Overberg*, 682 F.2d 605, 607 (6th Cir.1982) (en banc). This determination is made by evaluating the totality of the circumstances surrounding the case. *Angel v. Overberg*, 682 F.2d at 607.

> This Court employs a two-part test to determine whether prosecutorial misconduct warrants a new trial. *United States v. Carter,* 236 F.3d 777, 783 (6th Cir.2001) (citing *United States v. Carroll*, 26 F.3d 1380, 1385-87 (6th Cir.1994)). "Under this approach, a court must first consider whether the prosecutor's conduct and remarks were improper," and "then consider and weigh four factors in determining whether the impropriety was flagrant and thus warrants reversal." *Id.* (citing *Carroll,* 26

F.3d at 1387). The four factors which this Court considers include:

> (1) whether the conduct and remarks of the prosecutor tended to mislead the jury or prejudice the defendant; (2) whether the conduct or remarks were isolated or extensive; (3) whether the remarks were deliberately or accidentally made; and (4) whether the evidence against the defendant was strong.

> *Id.* (citing *Carroll,* 26 F.3d at 1385); *see also Boyle v. Million*, 201 F.3d 711, 717 (6th Cir. 2000); *United States v. Collins*, 78 F.3d 1021, 1039 (6th Cir. 1996).

*Girts v. Yanai*, 501 F.3d 743, 758-59 (6th Cir. 2007).   Upon review of the record, this Court agrees with the conclusion of the state appellate court that the challenged prosecutor's comments were not improper.

Claim three is without merit.

## CLAIMS FOUR AND THIRTEEN

In claims four and thirteen, petitioner asserts that he was denied a fair trial and the right to present a defense because the trial court prohibited him from inquiring on cross examination of Poch whether the alleged victim had confided to Poch that she had previously had sex after denying on direct examination that she had previously had sex. The state appellate court rejected this claim as follows:

> Jordan argues:

> "The trial court erred in refusing to allow the testimony of another witness concerning the past sexual activity of the victim, offered to refute AP's direct testimony she was a virgin."

> Jordan claims the Rape Shield Law does not apply in this case

since CA testified that she was a virgin at the time of the rape, thereby opening the door to impeach her with evidence of her prior sexual activity. The State argues the trial court's decision was correct because Jordan attempted to introduce the evidence of CA's prior sexual activity through another witness, rather than through cross-examination of CA herself.

R.C. 2907.02(D), commonly known as Ohio's Rape Shield Law, provides:

"Evidence of specific instances of the victim's sexual activity, opinion evidence of the victim's sexual activity, and reputation evidence of the victim's sexual activity shall not be admitted under this section unless it involves evidence of the origin of semen, pregnancy, or disease, or the victim's past sexual activity with the offender, and only to the extent that the court finds that the evidence is material to a fact at issue in the case and that its inflammatory or prejudicial nature does not outweigh its probative value."

"The statute essentially prohibits the introduction of any extrinsic evidence pertaining to the victims' prior sexual activity [since t]he only exceptions to this prohibition involve 'evidence of the origin of semen, pregnancy, or disease, or the victim's past sexual activity with the offender.' " *State v. Hart* (1996), 112 Ohio App.3d 327, 331. The Ohio Supreme Court has found that "[s]everal legitimate state interests are advanced by the shield law. First, by guarding the complainant's sexual privacy and protecting her from undue harassment, the law discourages the tendency in rape cases to try the victim rather than the defendant. In line with this, the law may encourage the reporting of rape, thus aiding crime prevention. Finally, by excluding evidence that is unduly inflammatory and prejudicial, while being only marginally probative, the statute is intended to aid in the truth-finding process." *State v. Gardner* (1979), 59 Ohio St.2d 14, 18-19. "It is within the sound discretion of the trial court to determine the relevancy of evidence and to apply R.C. 2907.02(D) to best meet the purpose of the statute." *Hart* at 331.

Jordan argues that the State waives application of the Rape

Shield Law if it asks a victim about her sexual history. However, the doctrine of waiver does not apply to this situation.

In *Gardner*, the defendant challenged the constitutionality of the Rape Shield Law, arguing that it prevented him from confronting the witnesses against him. In that case, the victim claimed, on cross-examination, that she had never engaged in prostitution. The defendant then attempted to call a witness who would testify that the victim had solicited sex from him. Citing *Chambers v. Mississippi* (1973), 410 U.S. 284, the Ohio Supreme Court held that courts must "balance the state interest which the statute is designed to protect against the probative value of the excluded evidence." *Id*. at 17. "The key to assessing the probative value of the excluded evidence is its relevancy to the matters as proof of which it is offered." *Id*. at 18. It concluded that "[e]vidence that complainant had a reputation as a prostitute is not sufficiently probative of consent to outweigh the state's legitimate interests in excluding the testimony, at least where there is no suggestion in the record that financial arrangements were entered into for sexual activities in this instance." *Id*.

In *State v. Williams* (1984), 16 Ohio App.3d 484, a case cited by Jordan as applying the doctrine of waiver, the court applied this balancing test. In *Williams,* the victim testified on direct examination that she was a lesbian and the defense sought to introduce evidence that she had had prior sexual relations with a man. The trial court refused to allow this evidence to be introduced but the appellate court reversed that decision. The court noted that the state's interests in the Rape Shield Law had to be balanced against the defendant's right to confront the witnesses against him.

"It is clear that in the instant case the prosecution is relying on the fact that the victim claims to be a lesbian as proof that she would never have consensual sexual relations with any man and that therefore she did not consent to sexual relations with appellant. This testimony was elicited by the prosecution on direct examination. The evidence is clearly substantially material, relevant and probative as to the element of force or

threat of force in consummating the admitted sexual activity. As we have noted, *supra*, consent is the fundamental issue in the case at bar.

"The evidence proffered by appellant would tend to show that the victim was lying when she said she was a lesbian and had never had consensual sexual relations with any man and that therefore she did not consent in the case *sub judice*. This evidence would go to the very heart of the issue of consent, the only issue contested at trial. The refusal to allow appellant to present evidence which is so highly probative, relevant and material as to an element of the crime violated his Sixth Amendment rights to confront the witnesses against him." *Id*. at 490.

Thus, *Williams* did not resort to the doctrine of waiver when it allowed this type of evidence to be introduced. Instead, it used a balancing test to balance the state's interests embodied in the Rape Shield Law against the defendant's rights.

The second case cited by Jordan, *State v. Hodge* (Aug. 17, 1992), 12th Dist. No. CA91-10-181, does say that the Rape Shield Law was "waived," but discusses this in a much different context than the present case. In *Hodge*, the defendant argued that the prosecution improperly introduced evidence of the victim's virginity. He claimed that this evidence was merely designed to inflame the jury into convicting him. There is no suggestion that the defendant tried to demonstrate that the victim had not been a virgin at the time of the offense.

In *Hodge*, the court noted that the Rape Shield Law was designed to protect the victim, not the accused. It then concluded that the defendant had waived any objection to the admission of this evidence since he first broached the topic of the victim's virginity during his opening statement.

The situation in this case is much different. Here, Jordan is arguing that the State has waived any challenge to his use of CA's sexual history. However, this was not the issue in *Hodge* and not the analysis adopted in *Gardner.*

We conclude that the trial court did not abuse its discretion when excluding this evidence. Jordan clearly has an interest in his right to confront the witnesses against him. However, the State also has the interests embodied in the Rape Shield Law. The balance of those interests in this particular case is similar to that in *Gardner*. Here, the issue being disputed was not really consent; rather it was whether Jordan and CA actually engaged in sexual conduct. CA's sexual history has no apparent bearing on this issue. Thus, Jordan's only interest in introducing this evidence is to impeach CA by showing that a largely irrelevant portion of testimony is possibly untruthful. The State's legitimate interests in the things protected by the Rape Shield Law in this case more than balances Jordan's interest in putting this single bit of impeaching evidence before the jury. Accordingly, we cannot conclude that the trial court abused its discretion when it excluded this evidence. Jordan's arguments in his fourth assignment of error are meritless.

*State v. Jordan, supra.* Again, review of the record fails to reflect that habeas corpus relief is warranted. *See Williams v. Taylor, supra.*

As to the alleged violation of Ohio evidentiary rules, as previously discussed, this claim does not provide a basis for federal habeas corpus relief.

> [U]nless a violation of a state's evidentiary rule results in the denial of fundamental fairness, an issue concerning the admissibility of evidence does not rise to the level of a constitutional magnitude.

*Hart v. Lafler,* 2008 WL 2622837 (E.D. Michigan June 30, 2008), citing *Cooper v. Sowders, supra; Davis v. Jabe,* 824 F.2d 483, 487 (6th Cir. 1987). "[T]he nuances of state rape-shield statutes are not questions of law appropriate for habeas review... [P]etitioner's only avenue is to argue that exclusion of the rape-shield evidence denied him his Sixth Amendment right to confront witnesses against him." *Id.*

However, petitioner does assert that the trial court's ruling denied him the right to present a defense and violated the Confrontation Clause.

> The Sixth Amendment Confrontation Clause guarantees the accused the right to cross examine adverse witnesses to uncover possible biases and expose the witness' motivation in testifying. *See Davis v. Alaska*, 415 U.S. 308, 315-16, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974). "Cross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested." *Id.* at 315. In cases "involving trial court restrictions on the scope of cross-examination, the [Supreme] Court has recognized that Confrontation Clause questions will arise because such restrictions may 'effectively ... emasculate the right of cross-examination itself.' " *Delaware v. Fensterer*, 474 U.S. 15, 19, 106 S.Ct. 292, 88 L.Ed.2d 15 (1985) (alteration in original) ( quoting *Smith v. Illinois*, 390 U.S. 129, 131, 88 S.Ct. 748, 19 L.Ed.2d 956 (1968)). It is well-established in constitutional jurisprudence that "the cross-examiner is not only permitted to delve into the witness' story to test the witness' perceptions and memory, but the cross-examiner has traditionally been allowed to impeach, i.e., discredit, the witness." *Davis*, 415 U.S. at 316. Moreover, "the exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination." *Id.*, at 316-17. The Supreme Court has held that "a criminal defendant states a violation of the Confrontation Clause by showing that he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, and thereby 'to expose to the jury the facts from which jurors ... could appropriately draw inferences relating to the reliability of the witness.' " *Delaware v. Van Arsdall*, 475 U.S. 673, 680, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986).

*Wiecek v. Lafler*, 2009 WL 2616343 (E.D. Michigan, August 25, 2009). Judges constitutionally retain wide latitude "to impose reasonable limits on ... cross examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness'

safety, or interrogation that is repetitive or only marginally relevant." *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986). Although the United States Supreme Court

> has not directly addressed the constitutionality of using rape-shield laws in the manner in which they were used in this case, though in *Michigan v. Lucas*, 500 U.S. 145, 111 S.Ct. 1743, 114 L.Ed.2d 205 (1991), the Supreme Court held that it was not a per se violation of the Confrontation Clause to severely limit cross-examination because the defendant failed to comply with notice rules set forth in Michigan's rape-shield law.

*Morningstar v. Haney*, 625 F.Supp.2d 434, 455 (E.D. Ky. 2008).

In *Boggs v. Collins*, 226 F.3d 728 (6th Cir. 2000), the United States Court of Appeals for the Sixth Circuit distinguished "general attacks" on credibility from "more particular" attacks aimed at revealing possible biases, prejudices or ulterior motives of a witness as related to issues in a case, and held that no violation of Confrontation Clause occurred from the trial court's prohibition of cross examination of the alleged rape victim regarding her purported prior false accusation of rape. *Id.*, 736-37.[1] In *Gordon v. Morgan*, 27 Fed.Appx. 528, 530, unpublished, 2001 WL 1563936 (6th Cir. December 5, 2001), the Sixth Circuit similarly concluded that no violation of the Confrontation Clause occurred from trial court's exclusion in a rape trial of evidence of victim's prior sexual conduct. In so holding, the Sixth Circuit noted:

> This circuit has consistently held that rape shield laws that

---

[1] Subsequent decisions of the Sixth Circuit have "called into question the distinction between an attack on a witness's general credibility and an attack directed toward revealing bias, prejudice, or motive for purposes of the Sixth Amendment." *Morningstar v. Haney, supra,* 625 F.Supp.2d at 442, citing *Hargrave v. McKee*, 248 Fed.Appx. 718, 727 (6th Cir. 2007); *Vasquez v. Jones*, 496 F.3d 564, 573-74 (6th Cir. 2007).

exclude irrelevant evidence do not violate a criminal defendant's right of confrontation. *Id*. at 1123 (approving Ohio Rev.Code Ann. § 2907.-02(E)); *Bell v. Harrison*, 670 F.2d 656, 659 (6th Cir.1982) (upholding Tenn.Code Ann. § 40-2445); *Haley v. Wilson*, No. 88-5389, 1988 WL 131496, at *1 (6th Cir. Dec.12, 1988) (upholding Ky.Rev.Stat. § 510.145).

*Id.*; *see also Nicely v. Lewis*, 2008 WL 833514 (E.D. Tenn. March 27, 2008)(same); *Jones v. Jackson*, 2006 WL 587712 (E.D. Michigan March 10, 2006)(no Confrontation Clause violation from trial court's exclusion of evidence of sexual relations between the victim and the defendant). Such were the circumstances here.[2] The trial court's refusal to permit questioning of the alleged victim regarding the largely irrelevant issue of whether or not she had any prior sexual experiences did not deny him the Constitutional right to present a defense. This Court cannot conclude that the state appellate court's rejection of this claim was so unreasonable as to warrant federal habeas corpus relief.

---

[2] *Compare Lewis v. Wilkinson*, 307 F.3d 413, 420-21 (6th Cir. 2002). In *Lewis*, the defendant in a rape case argued that he had consensual sex with the alleged victim. The trial court prohibited cross examination of the alleged victim on excerpt of her diary indicating:

> "... and I'm sick of myself for giving in to them. I'm not a nympho like all those guys think. I'm just not strong enough to say no to them. I'm tired of being a whore. This is where it ends."

*Id.* The United States Court of Appeals for the Sixth Circuit held that exclusion of cross examination on the diary excerpt denied the defendant right to confront his accuser, since the entry went directly to the issue of her consent and motive in bringing the charges. *Id.*, citing *Olden v. Kentucky*, 488 U.S. 227, 232 (1988)(Confrontation Clause violation resulted from trial court's exclusion of cross examination of alleged rape victim on her cohabitation with another man, where defense argued that she had concocted the story to protect that relationship).

Claims four and thirteen (i.e., supplemental claim three) are without merit.

## CLAIMS FIVE, SEVEN, AND ELEVEN

In claim five, petitioner asserts that he was denied the effective assistance of counsel because his attorney failed to call an expert witness to "defend and rebut non-traditional DNA testing and explain the effects of Tretiary (sic) transfer." *See Petition*. Respondent contends that this claim is waived, because petitioner failed to raise the claim in a petition for post conviction relief pursuant to O.R.C. §2953.21, and his ineffective assistance of counsel claim relies on evidence that is not readily apparent from the face of the record. *Return of Writ*, at 25. Similarly, in claim eleven, petitioner asserts that he was denied the effective assistance of trial counsel because his attorney failed to call a defense expert on DNA evidence to impeach testimony of the State's expert witness. Petitioner failed to raise this claim on direct appeal. Again, this claim necessarily relies on evidence not readily apparent from the face of the record, and therefore would properly be raised in a petition for post conviction relief; however, petitioner failed to pursue such action. Although he may still pursue a delayed post conviction petition, the record does not indicate that petitioner can meet the stringent requirements for consideration of his off-the-record claims of ineffective assistance of counsel in delayed post conviction petition under O.R.C. §2953.23, which provides:

> (A) Whether a hearing is or is not held on a petition filed pursuant to section 2953.21 of the Revised Code, a court may not entertain a petition filed after the expiration of the period prescribed in division (A) of that section or a second petition or successive petitions for similar relief on behalf of a petitioner

unless division (A)(1) or (2) of this section applies:

(1) Both of the following apply:

(a) Either the petitioner shows that the petitioner was unavoidably prevented from discovery of the facts upon which the petitioner must rely to present the claim for relief, or, subsequent to the period prescribed in division (A)(2) of section 2953.21 of the Revised Code or to the filing of an earlier petition, the United States Supreme Court recognized a new federal or state right that applies retroactively to persons in the petitioner's situation, and the petition asserts a claim based on that right.

(b) The petitioner shows by clear and convincing evidence that, but for constitutional error at trial, no reasonable factfinder would have found the petitioner guilty of the offense of which the petitioner was convicted or, if the claim challenges a sentence of death that, but for constitutional error at the sentencing hearing, no reasonable factfinder would have found the petitioner eligible for the death sentence.

(2) The petitioner was convicted of a felony, the petitioner is an inmate for whom DNA testing was performed under sections 2953.71 to 2953.81 of the Revised Code or under section 2953.82 of the Revised Code and analyzed in the context of and upon consideration of all available admissible evidence related to the inmate's case as described in division (D) of section 2953.74 of the Revised Code, and the results of the DNA testing establish, by clear and convincing evidence, actual innocence of that felony offense or, if the person was sentenced to death, establish, by clear and convincing evidence, actual innocence of the aggravating circumstance or circumstances the person was found guilty of committing and that is or are the basis of that sentence of death.

As used in this division, "actual innocence" has the same meaning as in division (A)(1)(b) of section 2953.21 of the Revised Code.

(B) An order awarding or denying relief sought in a petition

filed pursuant to section 2953.21 of the Revised Code is a final judgment and may be appealed pursuant to Chapter 2953. of the Revised Code.

Petitioner raised claim five on direct appeal; however, noting that nothing in the record supported petitioner's claim, the state appellate court rejected the claim as follows:

Jordan argues:

"Mr. Jordan was denied his constitutional guarantee of effective assistance of counsel."

To prevail on a claim of ineffective assistance of counsel, a defendant must demonstrate counsel's performance was deficient and that deficient performance prejudiced the defense. *Strickland v. Washington* (1984), 466 U.S. 668, 687. Ineffectiveness is demonstrated by showing counsel's errors were so serious that he or she failed to function as the counsel guaranteed by the Sixth Amendment. *State v. Hamblin* (1988), 37 Ohio St.3d 153, 156. To establish prejudice, a defendant must show there is a reasonable possibility that, but for counsel's errors, the result of the proceeding would have been different. *Strickland* at 694. A reasonable probability must be a probability sufficient to undermine confidence in the outcome of the case. *State v. Bradley* (1989), 42 Ohio St.3d 136, paragraph three of the syllabus. The defendant bears the burden of proof in demonstrating ineffective assistance of counsel. Smith at 100. Generally, the decision whether or not to call a witness is a trial tactic which will not sustain a claim of ineffective assistance of counsel. *State v. Payton* (1997), 124 Ohio App.3d 552, 558.

At trial, a technician from the Ohio Bureau of Criminal Investigation tested CA's underwear and a rug in AP's room for DNA. She detected DNA on the rug, testified that the DNA matched Jordan, and testified that "the expected frequency of occurrence of the DNA profile identified in the sperm fraction of the cutting from the rug is one in one hundred and twenty-nine quadrillion one hundred trillion individuals."

That same technician could not detect any male DNA on CA's

underwear, but found that one pair contained seminal fluid. She testified that there were more sensitive tests than she had available to her to test seminal fluid for DNA. Accordingly, the sample was sent to another lab for this other test. The technician from the other lab testified that this new test is "a little more sensitive" than the test run at the first lab, which meant that he could get results from either less or lower quality DNA. That test "could not exclude [Jordan] as a contributor to the DNA in that sample."

On appeal, Jordan argues that his defense counsel should have called an expert to testify on his behalf since "this new testing procedure can produce results with weaker samples it can also pick up trace amounts of DNA." The problem with this argument is that the facts Jordan relies on (the fact that this test may produce unreliable results) are not in the trial record. Instead, they are from an article written for the National Association of Criminal Defense Lawyers which is attached to Jordan's appellate brief. "[W]hen a defendant makes a claim of ineffective assistance of counsel based upon facts outside the record, the appropriate remedy is a petition for postconviction relief." *State v. Tackett*, 11th Dist. No.2003-A-0091, 2004-Ohio-6705, at ¶ 19.

All of Jordan's arguments are based on the facts in that article and none of those facts are in the record. Based on the evidence in the record, we cannot conclude either that Jordan's counsel acted deficiently or that his conduct prejudiced Jordan in any way. Accordingly, Jordan's fifth assignment of error is meritless.

*State v. Jordan, supra.* This Court agrees that nothing in the record demonstrates that expert testimony would have assisted the defense such that his attorney performed in a constitutionally ineffective manner under the test set forth in *Strickland v. Washington,* 466 U.S. 668 (1984), by failing to call an expert witness on DNA. The state appellate court's decision rejecting petitioner's claim is not so unreasonable as to warrant federal habeas

corpus relief. *See Williams v. Taylor, supra.*

Petitioner also asserted, in his application to reopen the appeal pursuant to Ohio Appellate Rule 26(B), that he had been denied the effective assistance of appellate counsel because his attorney failed to raise on appeal a claim of ineffective assistance of trial counsel based on his attorney's failure to call a defense expert on DNA evidence. He raises this same allegation in claim seven of this habeas corpus petition. However, again noting that petitioner's underlying claim relied on facts not apparent from the record, the state appellate court rejected petitioner's claim of ineffective assistance of counsel as follows:

> Appellant contends that his appellate counsel was ineffective for not raising the ineffectiveness of his trial counsel's failure to obtain an expert witness to controvert the testimony of the State's expert. This argument is assuming many things, least among them the fact that his trial counsel could have found such a person to testify on Appellant's behalf at trial. Moreover, the decision whether or not to call a witness is a trial tactic which will not sustain a claim of ineffective assistance of counsel. *State v. Payton* (1997), 124 Ohio App.3d 552, 558. In order to prove trial counsel's ineffectiveness in this regard Appellant would have to rely on facts that are not in the record, which we cannot do on direct review. *State v. Keith*, 79 Ohio St.3d 514, 534.... Given the record before us, we would have been forced to have found this assignment of error to be meritless.

*Exhibit 9 to Return of Writ.* Again, based on the record, this Court agrees that petitioner failed to establish the ineffective assistance of counsel under *Strickland.* The record is without support for his claim that any expert would have provided testimony to assist the defense. This portion of claim seven therefore likewise lacks merit.

Further, petitioner's off-the-record claims are waived. The state appellate court

explicitly noted that petitioner's claims would have been properly raised in a petition for post conviction relief. Because petitioner did not pursue a delayed post conviction petition, the state court's were never given the opportunity to enforce that procedural rule due to the nature of petitioner's procedural default. This Court deems the first and second parts of the *Maupin* test to have been met. Further, the procedural rule barring petitioner's claim constitutes an adequate and independent state ground for denying relief. The state courts must be given a full and fair opportunity to remedy alleged constitutional defects. The time limitations for filing a petition for post conviction relief serves the state's interests in finality and in ensuring that claims are adjudicated at the earliest possible opportunity. The third part of the *Maupin* test has therefore been met.

Moreover, petitioner has failed to establish either cause or prejudice for his procedural defaults. As previously discussed, the record fails to reflect that this is an extraordinary case, where a constitutional violation probably resulted in the conviction of one who is actually innocent, *see Murray v. Carrier, supra*, such that review of petitioner's claim nonetheless is warranted.

Therefore, claims five, eleven, and claim seven, in part, are waived or without merit**.**

## CLAIM SIX

In claim six, petitioner asserts that the evidence was constitutionally insufficient to sustain his convictions. The state appellate court rejected this claim as follows:

Jordan argues:

"There was insufficient evidence to convict Mr. Jordan of rape

because the State failed prove [sic] each and every element of the charged offenses beyond a reasonable doubt."

"Sufficiency of the evidence" is " 'a term of art meaning that legal standard which is applied to determine whether the case may go to the jury or whether the evidence is legally sufficient to support the jury verdict as a matter of law.'" *State v. Thompkins,* 78 Ohio St.3d 380, 386, 1997-Ohio-0052, quoting Black's Law Dictionary (6 Ed.1990) 1433. The relevant inquiry when determining whether the evidence is sufficient to support the verdict "is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks* (1991), 61 Ohio St.3d 259, *paragraph two of the syllabus.* "The verdict will not be disturbed unless the appellate court finds that reasonable minds could not reach the conclusion reached by the trier of facts." *Id.* at 273. Whether the evidence is legally sufficient is a question of law. *Thompkins* at 386.

Jordan was convicted of five different charges and challenges the sufficiency of the evidence supporting each of these convictions. We will address those issues in the order from the less serious offenses to the more serious offenses.

Unlawful Sexual Conduct with a Minor

R.C. 2907.04(A) and R.C. 2907.03(A)(5)

In the third count of the indictment, Jordan was charged with unlawful sexual conduct with a minor, CA, under R.C. 2907.04(A) and the jury found him guilty of this offense. That statute provides:

"No person who is eighteen years of age or older shall engage in sexual conduct with another, who is not the spouse of the offender, when the offender knows the other person is thirteen years of age or older but less than sixteen years of age, or the offender is reckless in that regard." R.C. 2907.04(A).

The seventh count in the indictment charged Jordan with a

sexual battery of AP under R.C. 2907.03(A)(5), which provides:

"No person shall engage in sexual conduct with another, not the spouse of the offender, when * * * [t]he offender is the other person's natural or adoptive parent, or a stepparent, or guardian, custodian, or person in loco parentis of the other person."

Jordan contends that there is insufficient evidence of sexual conduct between he and either CA or AP to support these convictions. " 'Sexual conduct' means vaginal intercourse between a male and female; anal intercourse, fellatio, and cunnilingus between persons regardless of sex; and, without privilege to do so, the insertion, however slight, of any part of the body or any instrument, apparatus, or other object into the vaginal or anal opening of another. Penetration, however slight, is sufficient to complete vaginal or anal intercourse." R.C. 2907.01(A).

In this case, there is clearly sufficient evidence, when it is viewed in the light most favorable to the State, to support these convictions. CA testified that Jordan performed cunnilingus on her, that she performed fellatio on him, and that the two engaged in sexual intercourse. AP testified that Jordan performed cunnilingus on her, that she performed fellatio on him, and that the two engaged in sexual intercourse. This is clearly evidence of sexual conduct. Jordan's arguments to the contrary are meritless.

Rape-Psychological Force Element

R.C. 2907.02(A)(2)

In the indictment's fifth count, Jordan was charged with raping AP under R.C. 2907.02(A)(2) and the jury found him guilty of this offense. R.C. 2907.02(A)(2) defines rape as follows:

"No person shall engage in sexual conduct with another when the offender purposely compels the other person to submit by force or threat of force."

Jordan contends that the State failed to introduce sufficient evidence to prove that he used force or the threat of force when engaging in sexual conduct with AP. His argument is contradicted by the record.

" 'Force' means any violence, compulsion, or constraint physically exerted by any means upon or against a person or thing." R.C. 2901.01(A). Force and threat of force "can be inferred from the circumstances surrounding sexual conduct." *State v. Schaim,* 65 Ohio St.3d 51, 1992-Ohio-0031, paragraph one of the syllabus. The forcible element is established where a defendant's actions create "the belief that physical force will be used if the victim does not submit" to the defendant's actions. *Id.* "A victim need not prove physical resistance to the offender" for a defendant to be found guilty of rape. R.C. 2907.02(C). "However, in order to prove the element of force necessary to sentence the defendant to life imprisonment, the statute requires that some amount of force must be proven beyond that force inherent in the crime itself." *State v. Dye*, 82 Ohio St.3d 323, 327, 1998-Ohio-0234.

In this case, there is little evidence that Jordan used or threatened physical force to compel AP to submit to sexual conduct. She testified that in the first incident Jordan "took my pants off * * * and he started eating me out," that he "made me give him head," that "he started having sex with me," and that "he put me in different positions" while they had sex. During the second incident he "made me eat him out and give him head and once again he started having sex with me, put me in different positions." At the third incident, Jordan "made me give him head." At none of these times, does AP describe the use or threat of physical force beyond that force inherent in the crime itself.

These facts are reflected in the trial court's instructions to the jury. The trial court used the statutory definition of force when defining that term for the jury with regard to Jordan's alleged rape of CA under R.C. 2907.02(A)(2), an offense for which he was acquitted, but used a different definition of force when defining that term with regard to the rape of AP under R.C. 2907.02(A)(2). When instructing the jury on that offense, the

trial court said as follows:

"Force means any violence, compulsion, or constraint exerted or used by any means against a person or thing.

"When the relationship between a victim and the perpetrator is one of a child and a parent or similar relationship, the element of force need not be openly displayed or physically brutal. It can be subtle, slight, and psychologically or emotionally powerful.

"If you find beyond a reasonable doubt that such relationship existed and under the circumstances in evidence the victim's will was overcome by fear or duress or intimidation, the element of force has been proved."

This definition of force has been called "psychological force" and was first used in *State v. Eskridge* (1988), 38 Ohio St.3d 56. In *Eskridge,* a father engaged in sexual conduct with his four year old child, but could not be sentenced to life unless the state could show that he used force to compel the victim to submit to the conduct. The *Eskridge* court concluded that there was evidence of force, noting that "[f]orce need not be overt and physically brutal, but can be subtle and psychological. As long as it can be shown that the rape victim's will was overcome by fear or duress, the forcible element of rape can be established." *Id*. at 58-59. It held that such force was present in that case because of the power a parent holds in a parent-child relationship. "The youth and vulnerability of children, coupled with the power inherent in a parent's position of authority creates a unique situation of dominance and control in which explicit threats and displays of force are not necessary to effect the abuser's purpose." *Id*. at 59. Accordingly, the court ultimately held:

"The force and violence necessary to commit the crime of rape depends upon the age, size and strength of the parties and their relation to each other. With the filial obligation of obedience to a parent, the same degree of force and violence may not be required upon a person of tender years, as would be required were the parties more nearly equal in age, size and

strength." *Id*. at paragraph one of the syllabus.

The Ohio Supreme Court revisited the issue in *State v. Dye*, 82 Ohio St.3d 323, 1998-Ohio-0234, and extended *Eskridge*'s basic holding to any adult who was in "[a] person in a position of authority over a child under thirteen." *Id. at syllabus*. When doing so, the Court recognized that relationships other than parent-child relationships may contain this same obligation of obedience since non-parent caregivers can occupy "the same position of authority as the parent traditionally would." *State v. Dye*, 82 Ohio St.3d 323, 329, 1998-Ohio-0234.

However, the Ohio Supreme Court has placed limits on when the *Eskridge* definition of "psychological force" can be used, even when the alleged perpetrator is a parent. In *State v. Schaim*, 65 Ohio St.3d 51, 1992-Ohio-0031, the victim said her father had subjected her to a pattern of sexual abuse that began when she was a preteen and continued until she was twenty years old. The Court found that *Eskridge* did not apply since the victim was an adult.

"*State v. Eskridge* is based solely on the recognition of the amount of control that parents have over their children, particularly young children. Every detail of a child's life is controlled by a parent, and a four-year-old child knows that disobedience will be punished, whether by corporal punishment or an alternative form of discipline. Because of the child's dependence on his or her parents, a child of tender years has no real power to resist his or her parent's command, and every command contains an implicit threat of punishment for failure to obey. Under these circumstances, a minimal degree of force will satisfy the elements of forcible rape. *Id.*, paragraph one of the syllabus.

"The same rationale does not apply to an adult. No matter how reprehensible the defendant's alleged conduct, a woman over the age of majority is not compelled to submit to her father in the same manner as is a four-year-old girl. She is no longer completely dependent on her parents, and is more nearly their equal in size, strength, and mental resources. Although we are aware of the devastating effects of incest on its victims, and are

sympathetic to the victim whose will to resist has been overcome by a prolonged pattern of abuse, we reluctantly conclude that a pattern of incest is not always a substitute for the element of force required by R.C. 2907.02(A)(2)." *Id*. at 55.

Since *Dye's* syllabus limits its application to children under the age of thirteen and *Schaim* states that *Eskridge* is based on "the amount of control that parents have over their children, particularly young children," defendants have challenged whether the definition of "psychological force" can be used in cases involving children aged thirteen or older. *See State v. Milam*, 8th Dist. No. 86268, 2006-Ohio-4742 (Thirteen year-old victim); *State v. Nieland*, 2d Dist. No.2005-CA-15, 2006-Ohio-0784 (Fifteen to sixteen year-old victim); *State v. Dippel*, 10th Dist. No. 03AP-448, 2004-Ohio-4649 (Fourteen year-old victim); *State v. Oddi*, 5th Dist. No. 02CAA01005, 2002-Ohio-5926 (Fifteen year-old victim); *State v. Musgrave* (Nov. 25, 1998), 9th Dist. No. 18260 (Thirteen year-old victim). In fact, this court just released an opinion in which a defendant made the same argument. *See State v. Haschenburger*, 7th Dist. No. 05 MA 192, 2007-Ohio-1562 (Fourteen to sixteen year-old victim). Each of these courts have rejected this argument, noting among other things, that the reasons underlying the *Eskridge* rationale can apply to teenagers as well as to preteens. *Haschenburger* at ¶ 44; *Milam* at ¶ 12; *Musgrave* at 8-9. It should further be noted that *Dye* had to be limited to applying to cases involving children younger than thirteen because it was dealing with a force specification under R.C. 2907.02(A)(1)(b), which only applies to cases involving preteen children. In *Haschenburger*, this court found that in cases involving perpetrators in a position of authority and teenagers, force is proven if the victim's will was overcome by fear or duress. *Id*. at 44.

In this case, AP testified that she acquiesced to Jordan's sexual demands because she was "scared" that Jordan "would get me in trouble." She said that he had previously taken her to the Jefferson County Jail, where she was locked up for a short while, after she had been caught smoking and that she thought this might happen again.

This evidence, when viewed in the light most favorable to the State, is sufficient to show that AP's will was overcome by fear of what Jordan, a person in a position of authority over her, would do if she did not comply. Accordingly, the State has presented sufficient evidence to prove that Jordan used or threatened force to compel AP to submit to the sexual conduct. Jordan's arguments to the contrary are meritless.

Rape-Substantially Impaired Element

R.C. 2907.02(A)(1)(c)

In its second and sixth counts, the indictment charged Jordan with raping AP and CA under R.C. 2907.02(A)(1)(c) and the jury found him guilty of these offenses. R.C. 2907.02(A)(1)(c) provides:

"No person shall engage in sexual conduct with another who is not the spouse of the offender or who is the spouse of the offender but is living separate and apart from the offender, when * * * [t]he other person's ability to resist or consent is substantially impaired because of a mental or physical condition or because of advanced age, and the offender knows or has reasonable cause to believe that the other person's ability to resist or consent is substantially impaired because of a mental or physical condition or because of advanced age."

Jordan claims that the State failed to prove that he committed these offenses because it failed to show that the girls' ability to resist or consent was substantially impaired.

The Ohio Supreme Court had held that "substantial impairment must be established by demonstrating a present reduction, diminution or decrease in the victim's ability, either to appraise the nature of his conduct or to control his conduct. This is distinguishable from a general deficit in ability to cope, which condition might be inferred from or evidenced by a general intelligence or I.Q. report." *State v. Zeh* (1987), 31 Ohio St.3d 99, 104. " 'Substantial impairment' need not be proven by expert medical testimony; it may be proven by the testimony of persons who have had some interaction with the victim and

by permitting the trier of fact to obtain its own assessment of the victim's ability to either appraise or control her conduct." *State v. Hillock*, 7th Dist. No. 02-538-CA, 2002-Ohio-6897, at ¶ 21.

In this case, CA testified that Jordan offered her a full bottle of Bacardi 151. CA testified that she was "pretty sure I drank all of it, but I'm not real sure." She testified that this made her "very" drunk. After CA drank the alcohol, Jordan engaged in sexual conduct with her.

CA's testimony is clearly sufficient, when viewed in the light most favorable to the State, to establish that Jordan knew her ability to resist would be substantially impaired. According to CA's testimony, Jordan plied her with liquor until she was drunk and then engaged in sexual conduct with her. Jordan's argument that the State failed to present evidence on this element of the offense is meritless.

The same holds true regarding the evidence supporting the conviction for the rape against AP. AP testified that Jordan "had me drink cranberry-either cranberry or raspberry vodka" before engaging in sexual conduct with her. It would be reasonable for a jury to conclude that vodka would substantially impair a fourteen year-old's ability to resist sexual advances.

There is sufficient evidence supporting each of Jordan's convictions under R.C. 2907.02(A)(1)(c). Jordan's arguments to the contrary appear to be meritless. Since each of Jordan's arguments about the sufficiency of the evidence supporting his convictions is meritless, his sixth assignment of error as a whole is meritless.

\*\*\*

CA, who was born on May 15, 1990, testified that she and AP were best friends and that she spent the Easter weekend in 2005 at AP's home. CA spent "a lot" of time at AP's home, was there "almost every weekend," and knew that Jordan lived in AP's household. On the Monday after Easter, March 28th,

Jordan told CA that her father was coming to pick her up. CA was excited about this, since her "dad's not always there," and stayed at AP's home while Jordan took AP to the home of a mutual friend of both AP and CA, KW. According to CA, Jordan left with AP between 9:00 and 9:30 in the morning and that he returned about thirty minutes later. She claimed that Jordan left a baby in the house with CA while he was gone.

After he returned, Jordan put the baby to bed, retrieved a bottle of Bacardi 151, and insisted that she drink the alcohol. She testified that she was "pretty sure I drank all of it but I'm not real sure," which made her "very" drunk. She then testified that Jordan began playing a pornographic movie for her in the living room. After the movie began, Jordan undressed CA and himself, so that CA was naked and he was just wearing a white shirt. He then put her down on a love seat and started to perform cunnilingus on her. After he finished, Jordan grabbed CA's arms, pulled her up, stuck his penis in her face, and told her, "Do this." CA described Jordan's erect penis as "about eight and a half, nine inches" and "a darker color." She stated that she refused to perform fellatio, though Jordan did place his penis in her mouth once.

After this, Jordan drug CA upstairs to AP's room. He "threw" CA onto the bed and "flipped" her onto her hands and knees. Jordan then placed his penis in CA's vagina while she faced away from him. After a few minutes, Jordan "flipped" CA onto her back and reinserted his penis into her vagina. She tried to push him away, but he said, "A few more minutes." Eventually, Jordan pulled his penis out of CA and manually stimulated himself until he ejaculated on CA's chest and face. He then left the room and CA blew her nose on the rug, since some of Jordan's ejaculate had gone up her nose. She then laid down in the bed "for a while." CA testified that she believed this all occurred between 10:00 and 11:00.

A bit later, CA woke up, "stumbled" downstairs, got dressed, and laid down on the couch. She states that the baby was not in the home at this time, even though it was at the time of the sexual conduct, and that she doesn't know what happened to it. CA began to vomit and Jordan got her a bucket to vomit

into. He then gave her some of AP's clothes to change into. After she was changed, he drove her to KW's house. She believes she arrived at KW's between 2:30 and 3:00, although she was not certain of the time. CA told AP what happened and AP advised that she not say anything. The two girls were later picked up by Jordan as they were walking to another friend's home. Jordan had been cut and was going to the hospital. That night, CA spent the night at AP's again and went to school with AP the next morning.

At school, CA told a teacher what had happened and that teacher referred her to the school's guidance counselor. The guidance counselor then contacted Department of Children and Family Services and Carrothers began his investigation. After school, CA told her mother what happened and was taken to a hospital, where medical personal examined her and completed a rape kit.

On cross-examination, defense counsel demonstrated some discrepancies between CA's description of the clothes she was wearing and the clothing put into evidence. She also denied that Jordan found drugs on the girls that evening when he stopped to pick them up on his way to the hospital.

The State's second witness was Duane Winston, a technician with a forensic laboratory that performed the more sensitive DNA testing on the seminal fluid on CA's underwear. He testified that neither the DNA on the underwear nor Jordan's genetic markers did not match those of the 4,004 people in the company's database. Furthermore, he could not exclude Jordan as the person who contributed that genetic sample. However, Winston clarified that this applied to all of Jordan's male paternal relatives as well.

Dr. David Schaffer is an emergency room physician at Harrison Community Hospital. He testified that Jordan came into the hospital at 3:40 and was treated for an injury to his shoulder.

Raymond Hibbs was the State's fourth witness. He was one of CA's teachers and testified that her appearance was noticeably

different on March 29, 2005, than her normal appearance. She told him that she had something personal to talk about and he asked a neighboring female teacher, Patricia Knoop, to be present. CA then told the two teachers that she had been raped. Hibbs watched the classes while Knoop took CA to the guidance office. Knoop corroborated Hibbs's testimony.

Pamela Tope, the guidance counselor at CA's school, corroborated Hibbs's testimony about CA's appearance on March 29, 2005. When Knoop brought CA to Tope, CA told her she had been sexually violated and Tope contacted Children Services.

The State's next witness was KW. She confirmed that Jordan brought AP to KW's home on the morning of March 28th and said she didn't see anyone with Jordan at that time. She said CA arrived at her house between 3:00 and 4:00 and was dropped off by Jordan. CA was "a mess" and "looked like she had been crying." Eventually, CA told her and AP that she had been sexually assaulted by Jordan. KW testified that Jordan picked AP and CA up from her house later that evening.

Shawna Everhart is AP's aunt and testified that Jordan stopped by her house at about 2:45 on March 28, 2005, and asked her to watch the baby. Jordan returned at about 6:00 to retrieve the baby. He told her he was dropping the baby off so he could have the cut on his arm seen to by a doctor.

The State next called two technicians from the Ohio Bureau of Criminal Identification and Investigation, Russell Edelheit and Stacy Violi. Edelheit testified that he found seminal fluid on a pair of CA's underwear and trace amounts of semen on the rug in AP's room. Viola testified that she could not recover any DNA from CA's underwear and that this was sent to an outside lab for further testing. She further testified that there was a one in one hundred and twenty-nine quadrillion one hundred trillion chance that the semen on the rug did not belong to Jordan.

Lucinda Hill was the nurse who collected the rape kit from CA.

She testified that CA told her that she was sexually assaulted after she was told to drink a large amount of alcohol. Hill discovered bruising in and around CA's vagina. She said these injuries were consistent with injuries she had seen in other sexual assault cases and consistent with the conduct CA had described. The doctor who examined CA at the hospital, Dr. Michelle Dayton, echoed these conclusions.

The local police chief testified that he was told of the sexual assault on CA on March 29th and interviewed the child with Carrothers for about an hour. He testified that CA appeared "very flustered" and "very distraught." As a result of that interview, the police arrested Jordan and searched his home. He and Carrothers then interviewed Jordan, who told them to "prove" that he committed the alleged acts.

Carrothers testified that he works for the Department of Job and Family Services and is primarily responsible for investigating allegations of child abuse and neglect. He became involved in this case on March 29th when his agency received a report that CA had allegedly been sexually assaulted. Carrothers first contacted CA's mother and the police to arrange a videotaped interview. After the interview, Carrothers advised CA's mother to take her to the hospital for a sexual assault examination. Carrothers then accompanied the police when they arrested Jordan, searched his home, and interviewed him. Carrothers testified that Jordan denied the allegations and dared the interviewers to "prove it." Jordan admitted CA was at his house at about 1:30 and that he took her to KW's home, but states that he had not been home at the time of the alleged incident.

Carrothers also arranged an interview with AP. He testified that she appeared frightened and that she cried during the interview. AP described three different instances and she gagged when describing these incidents. Based on the evidence collected in the investigations of these allegations, particularly the descriptions of Jordan's genitalia, Carrothers substantiated both allegations of abuse.

On cross-examination, Carrothers stated that he investigated

domestic abuse allegations against Jordan with regard to AP in March 2004. He could not substantiate the allegations of physical abuse at that time. Carrothers also acknowledged that he had investigated prior allegations of sexual abuse involving Jordan and AP, but clarified that AP had not made those allegations. After speaking with AP, Carrothers did not upgrade those allegations.

CA's mother confirmed that CA told her of the allegations after she got home from school on March 29th. Based on this information, she called Carrothers and brought CA in for an interview.

AP's mother, Christina, testified that Jordan had been her live-in boyfriend for eight years by March 2005. Earlier in March, Jordan had transferred the home into her name. Christina said that he did this because creditors were threatening to place a lien on the home. Christina testified that Jordan put it her name because "he didn't trust anybody but me with it." Christina had not owned a home before this since her divorce from her ex-husband. Christina stated that she had bought her son a bottle of Bacardi 151 on Saturday, March 26, 2005, the day before Easter.

On March 28th, she left for work at about 8:00 in the morning. According to Christina, CA had stayed at their home over Easter weekend and was present when she left for work. When Christina left, she forgot to take a lunch box to one of her sons.

At about 11:30, Jordan called her at work to tell her he had cut his arm on a nail, that he thought he might need stitches, and that he needed someone to watch the baby. He then stopped by Christina's work at about 2:00 to show her his arm. She said he seemed "in a hurry to leave" and had the baby with him at this time. The next time Christina saw Jordan was around 6:00, when he arrived home with both of the girls. Christina testified that CA did not have makeup on when they all arrived home, which was unusual, and that it appeared that she had been crying. She also testified that Jordan followed everyone around that night and smoked excessively, two behaviors which were not normal for him.

On March 29th, Jordan was doing laundry and burning garbage in the back yard when Christina came home. That laundry included some of her laundry and some of AP's, but none of Christina's son. Christina felt this was odd. Jordan also washed the sheets from AP's bed. Later, the police arrived to search the home and arrest Jordan. It was at this time that Christina learned of the alleged sexual assaults.

Christina further testified that she had forbidden AP from seeing a boy named Gary Woodard "because he was gothic" and smoked cigarettes. She did not know on March 28th that Gary Woodard smoked marijuana, but learned of this fact afterward.

Christina was asked about her sex life with Jordan. She testified that his favorite position was when she was on her knees with him behind her. She stated he also liked oral sex and to stand up with her on him. Finally, she stated he would always pull himself out of her before ejaculating and "spray it" on her. Christina said she did not like it when Jordan did this and told him so, but she did not feel she should "breakup over it." She denied ever having sexual relations with Jordan in AP's room or on the rug from AP's room.

Finally, Christina spoke about the previous allegations involving AP and Jordan. She said that her former husband alleged that Jordan was sexually abusing AP, but that AP denied those allegations. She also testified that allegations of physical abuse had been dismissed.

AP was the State's final witness. She confirmed that she lived with Jordan and that he dropped her off at KW's at about 9:30 on March 28th. She said that CA was at her house when she woke up, but did not come with her to KW's that morning because her dad was supposed to pick her up that morning. CA arrived at KW's later, at about 3:30. At that time, CA smelled like alcohol, "looked like really depressed," and said she had been sexually assaulted. After CA arrived at KW's, she and AP left to go to Woodard's to get a cigarette. AP testified that Woodard was her boyfriend.

AP testified that Jordan had sexually assaulted her three times. The first time, he had her drink flavored vodka and played a pornographic movie. Jordan then removed AP's pants and performed cunnilingus on her, then made her perform fellatio on him. Finally, he had sexual intercourse with her while she was on her knees and he was behind her. These acts occurred in the family's living room. The second time, they performed these same acts in her bedroom. This time, he ejaculated on AP's face and some got on her rug. The third incident happened in Jordan's truck. AP testified that Jordan made her perform fellatio on him and that she vomited when she was done. She described his genitalia as "about eight inches."

AP testified that she performed these acts because she was afraid that Jordan would punish her as he had done in the past. She also did not think her mother would believe her if she had told her what had happened. She said that she treated Jordan as a stepfather and that he treated her as a stepdaughter.

AP admitted that she smoked marijuana on a regular basis, "about every weekend," and that she did this with Woodard. She acknowledged that her mother had told her she was not to see Woodard. She said that Jordan started her habit of smoking marijuana and that she had purchased marijuana for him in the past.

AP testified about the previous domestic violence charge involving her and Jordan. She said that he picked her up by the throat when yelling at her. However, she eventually asked that the case be dismissed because "my mom was upset and I didn't want him to get into trouble." She recalled that Jordan's version of events was that he slapped her.

AP also testified about the sexual abuse allegations her father made with regard to Jordan. She said that the complaint was based on Jordan touching her the wrong way. AP told Carrothers, who investigated that claim, that these touches were accidental.

Finally, AP testified about an incident that happened after Jordan's arrest. Two girls came to AP's home and told her that

Woodard wanted to meet her at a bridge. The girls asked her about what Jordan did and asked her if she had lied about it. AP told them that she "wouldn't lie about something like that." While speaking to these girls, she saw a video camera in the area.

The first witness for the defense was Laken Jordan, Jordan's sister-in-law. She testified that Jordan was at her house at about 10:00 on March 28th with the baby and stayed until about 11:30. When Jordan left, he forgot the diaper bag, so Laken brought it to his home at about 1:30. She did not see anyone but Jordan and the baby at the house at this time. Laken testified that Jordan's demeanor at each of these times was "normal like he usually is," that he did not seem anxious, and that nothing seemed out of the ordinary. When Laken left the house, Jordan left as well with the baby to take a lunch box to Christina's son.

Laken also testified that she had asked two of her sister's friends to talk to AP while she videotaped the exchange. The plan was to have AP confess that the charges against Jordan were fabrications. However, the audio on the tape did not work. She denied ever seeing Jordan smoke marijuana.

One of the girls involved in the videotape incident, Ashley Chiadi, confirmed that Laken had asked her and another girl to speak with AP. Chiadi testified that AP said, "the thing with Eric didn't happen," but didn't mention the word rape. Kayla Williamson, the other girl involved, also testified that AP said "the Eric thing * * * didn't happen." She also stated that AP said the word "rape" and that AP raised the subject herself.

Laken's best friend, AP DiLoreto, confirmed that she saw Jordan with the baby at Laken's house at 11:30 on March 28th and that nothing seemed out of the ordinary. She was also present at his house with Laken at about 1:30. She said no one else was present and that Jordan left when they did.

Nick Jordan, Jordan's brother, testified that he was at Jordan's house often. On a couple of occasions, he caught Jordan and Christina in the act of sexual congress. On one of those

occasions, Nick found Jordan and Christina engaging in sexual intercourse in AP's bedroom. On other occasions, Nick could hear Jordan and Christina engaging in sexual relations upstairs in AP's bedroom while he watched the baby. Nick also stated that he had seen Jordan discipline AP for having cigarettes and marijuana in her room. Nick had never seen Jordan smoking marijuana.

The defense's last witness was Jordan himself. He testified that he left with AP to go to KW's house at about 9:00. He stopped by a title company to see about the transfer of the real estate, but there was a sign on the door saying they would be back in one hour. He then drove to his brother's house and arrived there sometime around 10:00. He stayed there until about 11:30 when he took the baby home so it could be fed. As he was leaving, he greeted DiLoreto, who was walking into Laken's home. After he arrived home, he cut himself on a nail that had been sticking out.

At about 12:30, CA knocked on the door and wanted a ride to KW's home. Jordan testified that CA looked normal and happy and said she had a good time with her dad. Jordan testified that they left at about 12:45 and that he dropped her off at about 1:00. He said he arrived home at about 1:15 and that Laken and DiLoreto arrived soon after to deliver the diaper bag. Christina's son then called about his lunch box, so Jordan left with the baby at about 2:00 to take the lunch box to him. After that, he drove to Christina's work to see if the dentist she worked for could stitch his wound. After finding out he could not, Christina suggested that he take the baby to Everhart while he was at the hospital. He arrived at Everhart's at about 2:45 and dropped the baby off. He then left to go to the hospital.

On the way to the hospital, he saw AP and CA and stopped his truck. He heard the girls speak about subjects he thought were inappropriate and asked them where they were coming from. They said they had been at Woodard's. AP admitted that she had been smoking marijuana at Woodard's home and he found marijuana in her purse. He told them to go back to KW's and that they would be in trouble. Jordan then went to the hospital,

where he was treated for his injury. He then picked up the girls and brought them home. He told the girls he would not tell anyone that night; instead, he gave the girls a chance to confess themselves first and would wait until Wednesday night to tell their mothers. At his police interview after his arrest, he stated he denied the allegations and said, "Look, if I'm lying please prove it."

Jordan testified that Christina had bought her son a bottle of Bacardi 151, but stated that Christina's son had taken it to his grandfather's house. Jordan denied using marijuana and denied having AP buy marijuana for him. He believed trace amounts of seminal fluid could have gotten on CA's underwear from contact with his clothing since there were clothes "strewn out all over the floor".

Jordan stated that he transferred his home to Christina because they were re-siding the house and needed a loan to get enough siding. Christina said she had better credit, so he should put the house in her name so she could use it as collateral.

Jordan said that he and Christina had sexual relations in every part of the house, even upstairs in AP's bedroom and confirmed that his brother had caught him and Christina in flagrante delicto in AP's room. He also confirmed that he would often pull himself out of Christina before he ejaculated. She told him, "She didn't want me, you know, to do that inside her because of the fact that after we got done and then she got dressed it would leak out onto her clothes," and that she preferred he ejaculate on her chest. He admitted that she did not like it when he ejaculated on her face, but stated that he never did this on purpose.

Finally, Jordan spoke about the prior allegations against him regarding AP. He said that AP's father made the allegations of sexual abuse in order to obtain custody of the children. AP told the investigator that Jordan had not acted improperly. As for the domestic violence allegation, he admitted that he became angry when AP called him an "asshole" and said he smacked her across the mouth. AP later recanted her accusation that something more than this happened and the charges were

dismissed.

*State v. Jordan, supra,* 2007 WL 1880029.   Again, the factual findings of the state appellate

court are presumed to be correct.  28 U.S.C. §2254(e).  Further, this Court may not grant

habeas corpus relief unless the state appellate court's decision contravened or involved an

unreasonable application of clearly established federal law, or was based on an

unreasonable determination of the facts.  28 U.S.C. §2254(d).  The record fails to reflect such

circumstances here.

    To the extent that petitioner contends that his convictions are against the manifest

weight of the evidence, such claim is not appropriate for federal habeas corpus relief.  The

Due Process Clause does not provide relief for defendants whose convictions are against

the manifest weight of the evidence, but only for those who have been convicted without

enough proof to allow a rational trier of fact to find guilt beyond a reasonable doubt. *Walker*

*v. Engle*, 703 F.2d 959, 969 (6th Cir.1983). In the context of a claim alleging a violation of due

process, "sufficiency of the evidence" refers to the due process requirement that there be

enough evidence introduced in favor of the prosecution for a rational trier of fact to find

each element of the crime beyond a reasonable doubt.  *Jackson v. Virginia,* 443 U .S. 307, 319

(1979). In reviewing a sufficiency of the evidence claim, a federal habeas court must defer

to the trier of fact with respect to issues of conflicting testimony, weight of the evidence,

and the credibility of the witnesses.  *Jackson*, 443 U.S. at 319; *Walke*r, 703 F.2d at 969.

    However, under Ohio law, a claim that a verdict was against the manifest weight

of the evidence-as opposed to one based upon insufficient evidence-requires the appellate

court to act as a "thirteenth juror" and review the entire record, weight the evidence, and consider the credibility of witnesses to determine whether "the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Martin,* 20 Ohio App.3d 172, 175 (1983); *cf. Tibbs v. Florida,* 457 U.S. 31 (1982). Since a federal habeas court does not function as an additional state appellate court, vested with the authority to conduct such an exhaustive review, any claim that petitioner's conviction was against the manifest weight of the evidence cannot be considered by this Court.

Before a criminal defendant can be convicted consistent with the United States Constitution, there must be sufficient evidence to justify a reasonable trier of fact to find guilt beyond a reasonable doubt. *Jackson v. Virginia, supra,* 443 U.S. ta 319. To determine whether the evidence was sufficient to support a conviction, this Court must view the evidence in the light most favorable to the prosecution. *Wright v. West*, 505 U.S. 277, 296 (1992)(citing *Jackson,* at 319.) The prosecution is not affirmatively required to "rule out every hypothesis except that of guilty." *Id.* (quoting *Jackson,* at 326). "[A] reviewing court 'faced with a record that supports conflicting inferences must presume-even if it does not appear on the record-that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.' " *Id.* (quoting *Jackson,* at 326).

For the reasons detailed by the state appellate court, this Court agrees that, when viewing all of the evidence in the light most favorable to the prosecution, *see Jackson v. Virginia, supra*, the evidence was constitutionally sufficient to sustain petitioner's

convictions.

Claim six is without merit.

## CLAIMS SEVEN, EIGHT, NINE, AND TEN

In claim seven, petitioner asserts that he was denied the effective assistance of appellate counsel. The state appellate court rejected this claim as follows:

> In his first three proposed assignments of error, Appellant challenges the application of the Ohio Supreme Court's recent decision in *State v. Foster*, 109 Ohio St.3d 1.... In that decision, the court found that portions of Ohio's felony sentencing scheme were unconstitutional. In order to remedy this defect, the court eliminated the need for trial courts to make statutorily required findings before imposing particular sentences. Appellant argues that the *Foster* decision improperly circumvents the constitutional right to a trial by jury, violates his due process rights and his right against the imposition of ex post facto laws, and leaves the trial court without authority to impose consecutive sentences.

> We recently rejected these arguments in *State v. Palmer*, 7th Dist. No. 06 JE 20, 2007-Ohio-1572. In that case, we noted that *Foster* specifically allowed the trial court to continue imposing consecutive sentences and that the imposition of non-minimum or consecutive sentences post-*Foster* did not violate due process or the prohibition against ex post facto laws. *Id.* at ¶14, 75. In reaching that decision, we "reiterated that we cannot overturn Ohio Supreme Court holdings and are bound by those holdings." *Id.* at ¶74.

> Given our decision in *Palmer*, there is not a reasonable possibility that the outcome of Appellant's direct appeal would have been any different had he himself raised these arguments. Relying on our recent precedent, we would have rejected Appellant's arguments. Thus, none of Appellant's first three proposed assignments of error demonstrate a genuine issue regarding appellate counsel's ineffectiveness.

In his fourth proposed assignment of error, Appellant contends that his appellate counsel was ineffective for not raising the ineffectiveness of his trial counsel's failure to obtain an expert witness to controvert the testimony of the State's expert. This argument is assuming many things, least among them the fact that his trial counsel could have found such a person to testify on Appellant's behalf at trial. Moreover, the decision whether or not to call a witness is a trial tactic which will not sustain a claim of ineffective assistance of counsel. *State v. Payton* (1997), 124 Ohio App.3d 552, 558. In order to prove trial counsel's ineffectiveness in this regard Appellant would have to rely on facts that are not in the record, which we cannot do on direct review. *State v. Keith*, 79 Ohio St.3d 514, 534.... Given the record before us, we would have been forced to have found this assignment of error to be meritless.

***

In conclusion, there is not a genuine issue regarding appellate counsel's failure to raise any of Appellant's four proposed assignments of error because we would have found each of those assignments of error to be meritless. Accordingly, Appellant's application to reopen his appeal is denied.

*Exhibit 9 to Return of Writ.* As discussed, the factual findings of the state appellate court are presumed to be correct. 28 U.S.C. §2254(e). Further, federal habeas relief may not be granted unless the state court's decision contravened or unreasonably applied federal law, or was based on an unreasonable determination of the facts in light of the evidence presented. 28 U.S.C. §2254(d). Petitioner has failed to establish such circumstances here.

The right to counsel guaranteed by the Sixth Amendment is the right to effective assistance of counsel. *McMann v. Richardson*, 397 U.S. 759, 771 n. 14 (1970). The standard for reviewing a claim of ineffective assistance of counsel is twofold:

First, the defendant must show that counsel's performance was

> deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Strickland v. Washington, supra*, 466 U.S. at 687; *see also Blackburn v. Foltz*, 828 F.2d 1177 (6th Cir.1987). "Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Strickland,* 466 U.S. at 689.

To establish prejudice, it must be shown that there is a reasonable probability that, but for counsel's errors, the result of the proceedings would have been different. *Id.,* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.,* at 697. Because petitioner must satisfy both prongs of the *Strickland* test to demonstrate ineffective assistance of counsel, if the Court determines that petitioner has failed to satisfy one prong, it need not consider the other. *Strickland,* 466 U.S. at 697.

The *Strickland* test applies to appellate counsel. *Burger v. Kemp*, 483 U.S. 776, 781-82 (1987). Counsel must provide reasonable professional judgment in presenting the appeal. *Evitts v. Lucey,* 469 U.S. 387, 396-97 (1985). " '[W]innowing out weaker arguments on appeal and focusing on' those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy." *Smith v. Murray*, 477 U.S. 527, 536 (1986)

(quoting Jones v. Barnes, 463 U.S. 745, 751-52 (1983)). The Court of Appeals for the Sixth Circuit has identified the following considerations that ought to be taken into account in determining whether counsel on direct appeal performed reasonably competently:

> 1. Were the omitted issues "significant and obvious?"
>
> 2. Was there arguably contrary authority on the omitted issues?
>
> 3. Were the omitted issues clearly stronger than those presented?
>
> 4. Were the omitted issues objected to at trial?
>
> 5. Were the trial court's rulings subject to deference on appeal?
>
> 6. Did appellate counsel testify in a collateral proceeding as to his appeal strategy and, if so, were the justifications reasonable?
>
> 7. What was appellate counsel's level of experience and expertise?
>
> 8. Did the Petitioner and appellate counsel meet and go over possible issues?
>
> 9. Is there evidence that counsel reviewed all the facts?
>
> 10. Were the omitted issues dealt with in other assignments of error?
>
> 11. Was the decision to omit an issue an unreasonable one which only an incompetent attorney would adopt?

*Mapes v. Coyle,* 171 F.3d 408, 427-28 (6th Cir.1999). This list is not exhaustive and need not produce a certain "score." *Id.* at 428.

The United States Supreme Court has held that the Sixth Amendment does not preclude judicial fact finding prior to imposition of consecutive sentences. *Oregon v. Ice,* ---U.S. ----, 129 S.Ct. 711, 714-15 (2009). Further, this Court agrees with other courts that have

considered the issue and which have rejected this claim.

Article I, § 10 of the United States Constitution provides that no state shall pass *ex post facto* laws. U.S. Const, Art. I, § 10. The Constitution's bar against *ex post facto* laws, however, does not apply to courts:

The *Ex Post Facto* Clause, by its own terms, does not apply to courts. Extending the Clause to courts through the rubric of due process ... would circumvent the clear constitutional text. It also would evince too little regard for the important institutional and contextual differences between legislating, on the one hand, and common law decision making, on the other.

*Rogers v. Tennessee,* 532 U.S. 451, 460, 121 S.Ct. 1693, 149 L.Ed.2d 697 (2001).

Although the *Ex Post Facto* Clause does not apply to courts, "limitations on *ex post facto* judicial decision making are inherent in the notion of due process." *Id.* at 456. In particular, the Supreme Court has found that courts may not unexpectedly and indefensibly construe a criminal statute so as to criminalize conduct which had not been criminal prior to the court's new construction. *See Bouie v. City of Columbia,* 378 U.S. 347, 84 S.Ct. 1697, 12 L.Ed.2d 894 (1964). The Supreme Court has explicitly declined to apply all the protections of the *Ex Post Facto* Clause to courts by way of the due process clause:

To the extent petitioner argues that the Due Process Clause incorporates the specific prohibitions of the *Ex Post Facto* Clause ... petitioner misreads *Bouie.* [N]owhere in the opinion did we go so far as to incorporate jot-for-jot the specific categories of [protection in the *Ex Post Facto* Clause] into due process limitations on the retroactive application of judicial decisions.

Nor have any of our subsequent decisions addressing *Bouie*-type claims interpreted *Bouie* as extending so far. Those decisions instead have uniformly viewed *Bouie* as restricted to its traditional due process roots. In doing so, they have applied *Bouie's* check on retroactive judicial decision making not by reference to the *ex post facto* categories [of protection], but,

rather, in accordance with the more basic and general principle of fair warning that *Bouie* so clearly articulated.

Petitioner observes that the Due Process and *Ex Post Facto* Clauses safeguard common interests-in particular, the interests in fundamental fairness (through notice and fair warning) and the prevention of the arbitrary and vindictive use of the laws. While this is undoubtedly correct, petitioner is mistaken to suggest that these considerations compel extending the strictures of the *Ex Post Facto* Clause to the context of common law judging.... Moreover, "[g]iven the divergent pulls of flexibility and precedent in our case law system," incorporation of the [categories of protection in the *Ex Post Facto* Clause] into due process limitations on judicial decision making would place an unworkable and unacceptable restraint on normal judicial processes and would be incompatible with the resolution of uncertainty that marks any evolving legal system.

*Id.* at 458-461 (citations omitted).

The Supreme Court has never held that the retroactive application of a judicial reconstruction of a statute that results in the loss of a presumption of a minimum sentence within a sentencing range violates the *Ex Post Facto* Clause or the due process clause of the United States Constitution.

*Pitts v. Warden,* 2008 WL 4758697 (N.D.Ohio October 29, 2008) (footnote omitted).

Under the Ex Post Facto Clause of the United States Constitution, a state is prohibited from passing a law that (1) "makes an action done before the passing of the law, and which was innocent when done, criminal;" (2) "aggravates a crime, or makes it greater than it was, when committed;" (3) "changes the punishment, and inflicts a greater punishment, than the law annexed to the crime, when committed;" and (4) "alters the legal rules of evidence, and receives less, or different, testimony, than the law required at the time of the commission of the offense, in order to convict the offender."

*Rogers v. Tennessee*, 532 U.S. 451, 456 (2001) (quoting *Calder v. Bull,* 3 U.S. 386, 390, 3 Dall. 386, 1 L.Ed. 648 (1798) (Chase, J.));

see also U.S. Constit. Art. I, § 10. As petitioner apparently concedes (*see* Doc. 14, p. 11), Ex Post Facto Clause concerns are not triggered in the case-at-hand because "by its very text [the clause] applies only to a limitation on the powers of the legislature and not to judicial decisions." *McGhee v. Konteh,* No. 1:07cv1408, 2008 WL 320763, at *10 (N.D.Ohio Feb.1, 2008) (unpublished); *see also Rogers,* 532 U.S. at 456, 460 (refusing to extend the strictures of the Ex Post Facto Clause to judicial decisions "through the rubric of due process").

Nevertheless, the Fourteenth Amendment's Due Process Clause does limit *ex post facto* judicial decision-making. *Rogers,* 532 U .S. at 456. Although the Due Process Clause does not incorporate the specific prohibitions of the Ex Post Facto Clause, retroactive judicial decision-making must comport with "core due process concepts of notice, foreseeability, and, in particular, the right to fair warning as those concepts bear on the constitutionality of attaching criminal penalties to what previously had been innocent conduct." *Id.* at 459 (citing *Bouie v. City of Columbia,* 378 U.S. 347, 351, 352, 354-55, 84 S.Ct. 1697, 12 L.Ed.2d 894 (1964)); *see also United States v. Barton,* 455 F.3d 649, 654 (6th Cir.) ("when addressing *ex post facto*-type due process concerns, questions of notice, foreseeability, and fair warning are paramount"), *cert. denied,* 549 U.S. 1087, 127 S.Ct. 748, 166 L.Ed.2d 579 (2006).

... [P]etitioner is unable to prevail on any claim that he lacked sufficient notice or "fair warning," because *Blakely, Booker,* and *Foster* did not change the elements necessary to convict petitioner ... and petitioner was aware of the potential penalties he faced ... [B]oth before and after *Foster,* petitioner was on notice and thus had "fair warning" of the potential penalties he faced and of the trial court's discretion to impose those penalties.

*Hooks v. Sheets,* 2008 WL 4533693 (S.D. Ohio October 3, 2008); *see also Clagg v. Wolfe,* 2009 WL 1424427 (S.D. Ohio May 20, 2009)(same); *Trewartha v. Brunsman*, 2009 WL 614963 (S.D. Ohio March 5, 2009)(same); *Smith v. Wilson,* 2008 WL 4758696 (N.D. Ohio October 29, 2008)

(same).

Therefore, appellate counsel did not perform in a constitutionally ineffective manner by failing to raise on appeal claims that petitioner's sentence violated the Ex Post Facto Clause, due process, or that imposition of consecutive terms of incarceration violated the Sixth Amendment. Claim seven is without merit. Claims eight through ten, wherein petitioner asserts that his sentence violated the Ex Post Facto Clause, due process and the Sixth Amendment because the trial court imposed more than minimum consecutive terms of incarceration, likewise are without merit.

For all the foregoing reasons, the Magistrate Judge **RECOMMENDS** that this action be **DISMISSED.**

If any party objects to this *Report and Recommendation,* that party may, within ten (10) days, file and serve on all parties a motion for reconsideration by the Court, specifically designating this *Report and Recommendation,* and the part thereof in question, as well as the basis for objection thereto. 28 U.S.C. §636(b)(1)(B)1; Rule 72(b), Fed.R.Civ.P.

The parties are specifically advised that failure to object to the *Report and Recommendation* will result in a waiver of the right to *de novo* review by the District Judge and waiver of the right to appeal the judgment of the District Court. *Thomas v. Arn,* 474 U.S. 140, 150-52 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir.1981).

/s/ Terence P. Kemp        
United States Magistrate Judge